# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
September 22, 2010 Session

## PRESTIGE LAND COMPANY v.
## BRIAN MULLINS EXCAVATING CONTRACTORS, INC.

### Appeal from the Chancery Court for Roane County
### No. 15233     Frank V. Williams, III, Chancellor

---

### No. E2009-02609-COA-R3-CV   - FILED OCTOBER 29,  2010

---

Prestige Land Company ("Developer") owned land upon which it intended to build a commercial shopping center. An estimate to complete the project was obtained. Thereafter, the project was opened up for bidding. Brian Mullins Excavating Contractors, Inc. ("Contractor") bid on the project. Although Contractor's bid was significantly lower than the next lowest bid, it was only 10% lower than the estimated costs of construction. Contractor was unaware that it had made a unilateral mistake in its bid. Contractor was awarded the project. Eventually, Contractor was unable to complete the project because it ran out of money due to its unilateral bidding mistake. Developer sued for breach of contract, and Contractor filed a counterclaim for fraud and other claims. The Trial Court awarded Contractor a judgment for $101,357.05. Finding no clear and convincing evidence of fraud by Developer, we vacate the judgment for Contractor and enter a judgment for Developer in the amount of $128,326.56.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the
### Chancery Court Vacated; Case Remanded

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and JOHN W. MCCLARTY, J., joined.

C. Paul Harrison and Garrett P. Swartwood, Knoxville, Tennessee, for the Appellant, Prestige Land Company.

Richard M. Smith and Craig N. Mangum, Nashville, Tennessee, for the Appellee, Brian Mullins Excavating Contractors, Inc.

# OPINION

## Background

This construction lawsuit involves the building of Pinnacle Pointe Development in Harriman, Tennessee. Developer sued Contractor for breach of contract after Contractor ran out of money and was unable to complete the project as required by the contract between the parties. Developer also sued Ohio Farmers Insurance Company ("Ohio Farmers") on a performance bond issued on the project. According to the complaint:

> On or about April 1, 2003, [Developer] entered into a written contract (the "Contract") with [Contractor] in connection with a construction project in Harriman, Tennessee, known as the Pinnacle Pointe Development (the "Project"). . . .
>
> In accordance with the Contract, [Contractor] was required, among other things, to perform its work in accordance with a certain schedule of Completion Dates attached to the Contract.
>
> On or about April 1, 2003, Ohio Farmers provided a Performance Bond in connection with the Project. . . . The Performance Bond bound Ohio Farmers to perform the Contract between [Developer and Contractor], in the event [Contractor] failed to perform.
>
> Work by [Contractor] commenced in or about April of 2003.
>
> [Contractor], however, failed to complete the work under the Contract in a timely manner pursuant to the Schedule of Completion Dates.
>
> [Contractor's] default under the Contract delayed the use of the Project by [Developer], thereby causing [Developer] significant damages. [Developer] is entitled to recover liquidated damages for these delays from [Contractor] in the amount of $7,000.00 per day under the terms of the Contract.

[Developer] notified Ohio Farmers of [Contractor's] default and Ohio Farmers has refused to render performance of the Contract pursuant to the terms of the Performance Bond.

As a direct result of [Contractor's] failure to complete the Project timely, and Ohio Farmer's failure to perform under the Performance Bond, [Developer] was forced to complete the work itself with another contractor.[1] (original paragraph numbering omitted; footnote added)

Contractor filed an answer and counterclaim against Developer. In its answer, Contractor denied any liability to Developer. According to Contractor[2]:

[Contractor] served as the site work contractor on the Project and held a prime contract with [Developer]. The above referenced Project involved the development of multiple parcels of real estate in preparation for a multi-use retail development. [Contractor] bid the work on or around March 28, 2003. [Contractor's] bid did not anticipate the poor subsurface conditions, and thus underestimated the labor and material needed to complete the Project. [Contractor's] bid was fifty five percent or $1,869,220.00 lower then (sic) the next lowest bidder. Subsequent to the bid opening [Developer] falsely represented to [Contractor] that the bid spread between the contractors was very close. [Contractor] relied on the assurances provided by [Developer] and entered into a contract with [Developer] on April 1, 2003, for an amount significantly below the cost of construction. . . .

[Contractor] diligently prosecuted the work and has supplied or caused to be supplied materials and labor necessary for improvements to the Project. [Contractor] struggled throughout the Project to meet their financial obligations due to

---

[1] Ohio Farmers eventually settled Developer's claims against it for $150,000 and an order of partial dismissal was entered. The agreed order of partial dismissal specifically stated that it did not affect any claims between Ohio Farmers and Contractor. We will discuss Ohio Farmers only to the extent its settlement with Developer affects the claims against Contractor or is otherwise pertinent to resolving this appeal.

[2] The counterclaim consists of numerous one-sentence paragraphs. When quoting the counterclaim, we have combined the paragraphs and eliminated the paragraph numbering.

their mounting losses. Near the end of the Project, [Contractor] had consumed all of its operating capitol (sic) and was unable to complete a small portion of the project.

Contractor filed several liens pursuant to Tenn. Code Ann. § 66-11-101, *et seq.* and sought enforcement of these liens. Contractor also brought claims against Developer for fraud, misrepresentation and deceit, and unjust enrichment. Contractor sought a judgment in the amount of $958,565.56.

Developer responded to the counterclaim and denied any liability to Contractor. Developer further claimed, among other things, that the liens were statutorily defective, that Contractor was estopped from making the claims asserted in the counterclaim, and that Contractor failed to state a claim for unjust enrichment.

In February 2009, Developer filed a motion for summary judgment seeking dismissal of Contractor's counterclaim. Developer claimed that the undisputed material facts established that: (1) Contractor waived any and all lien claims when it executed a Final Waiver and Release in June 2004; (2) Contractor failed to comply with the requirements of Tenn. Code Ann. § 66-11-126 when it failed to bring suit against the owners of the property in question; and (3) Contractor failed to state a claim for *quantum meruit* because Contractor already had been paid more than the contract price. Attached to the motion was a document titled "Final Waiver and Release of Lien" signed by Contractor's president, Brian Mullins, and which provides as follows:

> [Contractor] releases all liens and rights to lien the property, any state or federal statutory bond right, any private bond right, any claim for payment and any rights under any similar ordinances, rule or statute related to claim or payment rights for persons in the undersigned's position, the undersigned has on the real property at <u>Pinnacle Pointe Development in Harriman Tennessee</u>.
>
> This release covers all labor, services, equipment or materials furnished to the property or furnished to any person or company related to the property.
>
> The undersigned warrants that it has paid in full its laborers, subcontractors, materialmen, and suppliers for all work, materials, equipment or services provided for or to the above referenced project up to the date of this waiver. The

undersigned also agrees to indemnify, defend, and hold harmless [Developer] and The City of Harriman, TN from any claim or lien associated by any of its subcontractors, materialmen, and suppliers, and to bondoff, pursuant to Tennessee law, any claimed lien.

While the motion for summary judgment was pending, Contractor filed a motion seeking permission to amend its counterclaim to assert a third party complaint against Steve Kirkham, Jerry Duncan, David Robinette, and Site, Inc. claiming "fraudulent acts and conduct of [Developer], Duncan and Kirkham in conspiring with Site, Inc., and Robinette to fraudulently conceal a bid mistake from [Contractor] in furtherance of their pecuniary gains." Contractor also claimed:

> [T]his cause of action arises out of the fraudulent claim submitted by Duncan and Kirkham with the assistance of Robinette to [Contractor's] Surety, Ohio Casualty Insurance Company. The fraudulent claim caused [Contractor's] Surety to assert indemnity claims against [Contractor] and [Contractor's owner] individually.

Contractor asserted claims for intentional and/or negligent misrepresentation, fraud, deceit and conspiracy. Thereafter, Contractor again sought to amend the complaint, this time to add the owners of the property at issue.

On March 13, 2009, the Trial Court granted partial summary judgment with respect to many of Contractor's various claims. According to the Trial Court:

> The owners of the property sought to be liened were not parties to this lawsuit, nor was their property properly attached within the time required by Tenn. Code Ann. § 66-11-101, *et seq*.

> The final waiver and release of lien . . . was duly signed by Mullins dated June 20, 2004, [and] is valid and binding upon [Contractor] and releases any contractual claims for payment by [Contractor] against [Developer].

> The Court makes the following rulings of law.

The first argument by [Developer] was that [Contractor] failed to bring suit against each of the owners of the property, pursuant to Tenn. Code Ann. § 66-11-126, when he brought his counterclaim and each owner was a necessary party. The Court finds that argument well taken as the statute is to be strictly construed and each of the owners was a necessary party. The Court finds that the liens . . . are ineffective and thus are dismissed and released in full since the owners were not made a party to the lawsuit within the time allowed by statute.

The second argument by [Developer] was that [Contractor] waived all rights to make a claim for payment or to file liens against the property when it executed a Final Waiver and Release of Lien, dated June 20, 2004. The Court finds that the release and waiver is binding as to all contract claims, and thus, releases any and all contractual claims for payment by [Contractor] against [Developer], but to the extent [Contractor] is asserting a claim for fraud or concealment, the Court withholds a ruling on the effect of the release and waiver.

The third and last argument of [Developer] was with regard to the claim being asserted under quantum meruit by [Contractor]. The Court denies the motion for summary judgment because to the extent [Contractor] is able to assert some quasi contractual claim or other equitable relief based on the alleged fraud, then the claim for quantum meruit or other possible remedy may remain as a possibility, and thus the Court denies that motion for summary judgment.

It is therefore ordered that the Motion for Partial Summary Judgment is granted and the liens are ineffective and void, and thus they are hereby released. This order shall serve as a release of those liens attached hereto in Exhibit A. Partial Summary Judgment is hereby entered in favor of [Developer] against [Contractor] as to any contractual claims asserted against [Developer] by [Contractor] as the final waiver and release of lien releases any of those claims except the claims of fraud. (original paragraph numbering omitted).

It was not until after partial summary was granted that the Trial Court denied Contractor's motion to add certain new parties. The Trial Court also refused to allow new fraud allegations against Developer and allowed the case to proceed under the "originally asserted fraud claim . . . ."[3]

The trial began on July 7, 2009. At issue was Developer's claim for monetary damages resulting from Contractor's alleged breach of contract. The only surviving claim by Contractor was a claim for fraud premised upon Developer fraudulently allowing Contractor to rely on its bid which Developer allegedly knew contained a significant error. More specifically, Contractor claimed that it neglected to include a "swell factor" for removing a substantial amount of shale from the site. This error caused Contractor to significantly underbid the project because much more material had to be hauled away from the site than was contemplated by Contractor in its bid.

The first witness at trial was Steve Kirkham ("Kirkham"), a general partner and manager of Developer. Kirkham testified that over time, he and his business partner, Jerry Duncan, had purchased smaller lots in Roane County until eventually they owned enough land to build a shopping center. Developer engaged Site, Inc., to help it with the engineering for the shopping center, which was to include a Lowe's. David Robinette ("Robinette") owned Site, Inc., and he was highly recommended as he had done engineering work on several Wal-Mart shopping centers. According to Kirkham, the agreement entered into between Developer and Lowe's provided for liquidated damages of $7,000.00 per day if the building was not completed on time. When the project was not completed timely, Lowe's served notice on Developer that it was seeking a substantial amount of liquidated damages. Kirkham testified that Developer eventually "negotiated out of it" and neither Developer nor Contractor ended up paying Lowe's any liquidated damages.

Site, Inc., prepared two estimates for the cost of the entire project. According to Kirkham, the reason for the difference in the amount of the two estimates was the first and higher estimate involved Developer owning the property and leasing it, and the second and lower estimate involved eventually selling the land to Lowe's. The second and lower estimate was for $3,734,987.04. This second estimate reflects the work that was bid on and was to be performed by Contractor, the successful bidder on the project.

Kirkham has known Brian Mullins ("Mullins") for approximately thirty years. Prior to the project opening up for bids, Mullins allegedly told Kirkham that he "really

---

[3] The Trial Court also noted that because the liens had been dismissed, Contractor had withdrawn its motion to amend to add the landowners as parties.

wanted this project. It's something that's going to move me to the next level in my industry, and I can do a good job for you. You know, I really, really want it." Kirkham added:

> And my comment to Brian all along was, hey, we would love for somebody local to get it, and you're going to have to sharpen your pencil, because we're going to go with the low bidder. We're going to submit bids. David Robinette is going to come up with bid specs. He's going to give everybody a package. Everybody is going to be on a level playing field. And you just need to get your pencil sharp.

On March 28, 2003, Contractor submitted a bid on the project for a total amount of $3,363,980. Mullins was notified that his company, i.e., Contractor, was the lowest bid on the project. Kirkham scheduled a meeting with Mullins within two days. The meeting took place in Kirkham's office. Present at the meeting was Kirkham, Jerry Duncan, and Jim Gardner. Also present was David Robinette with Site, Inc., and "James Redmond and John Smith were there with Brian [Mullins]." Kirkham testified that this meeting took place before the contract was signed because Developer had some questions that needed to be answered by Contractor before entering into a contract. According to Kirkham:

> We wanted to make sure – you know, we never discussed bid spreads, but I remember Jerry Duncan sitting in the meeting and looking at Brian [Mullins] and saying, Brian, Steve and I are not contractors. We don't know anything about earth moving. Are you sure you can do this project for this price?

> And Brian was adamant that he could, and he looked at David Robinette and said, did my competition plan on wasting any of the dirt on the back of the site behind Lowe's and Kroger's? And David said, no, they were going to haul it off. And he said, well, I've outsmarted my competition. I'm going to waste a lot of dirt up there I don't have to haul off site.

> He asked David if the competition was going to blast, and David said, yes, he thought so. And he said, well, I'm going to rip it out. I'm not going to have to blast.

> He said, was my competition going to haul the dirt off, or were they going to haul it across the highway and dump it? And he said, David said his understanding was they were going to

haul it off. And Brian said, well, I'm planning on hauling all that dirt across the road; said I'm going to pan it across the road. And then he said, and I've also got the Highway 58 bridge project right now. And I remember Brian saying a number somewhere in the neighborhood of a half million dollars' worth of dirt off this project I'm putting on that State project down there, you know, selling them the dirt or however he was going to handle the accounting on that.

So in our minds, I mean, we knew there was about a million, million and a half difference between Brian's estimate and the next person's estimate, and I – you know, I never saw any of the bids. I just was told what the dollar amount was on Brian's and on the next one. And David had gone back. He said – after he got the bids, I remember David saying, I want to go through and check and make sure that Brian has not left something out that the other people have bid on. And David verified to us, said, hey, he's got everything on there; everything on the bid specs he's got.

So we knew that there was about a million and a half difference in the actual bids, and we knew that Brian was within a few hundred thousand dollars of what David's estimate had been. And we felt – Jerry and I felt that David's estimate, with David's credentials, that , you know, that had to be an accurate estimate. . . .

So when Brian told us, guys, I'm going to waste the dirt up on top of the hill, I'm not going to haul it off, I'm going to pan the dirt across the road, I'm not going to blast, I've sold a half million dollars worth of dirt to the State for the Highway 58 bridge project, in our minds, that kind of explained why the difference. It kind of filled the gap in the difference, you know, that million and a half difference. And we – and Brian was adamant at that meeting, yes, I can do it.

And we adjourned for a few minutes, and Jerry and David and I stepped into the office next to the conference room and talked, and we all said, hey, that explains the difference.

We all felt comfortable with it. And right after that, we signed the contract with Brian to do the job.

Kirkham went on to state that the amount of the other bids was never brought up at the meeting. Kirkham added that bids typically are disclosed only in government contracts and not in private contracts such as the one involved here.

Kirkham testified that at first the project seemed to move along smoothly except for numerous rain delays. Then Contractor started getting behind and equipment started breaking down. When Contractor was approximately 80% through the project, Mullins told Kirkham that he was in the hole and needed more money.

Kirkham testified that on September 27, 2004, a letter of default was sent by Developer to Contractor. This letter advised Contractor that a material amount of the work had not been completed by the due dates set forth in the contract. Developer advised Contractor that it was in default of the contract, that it had failed to respond to prior default letters requesting a response to Contractor's failure to perform, all work on the contract was to cease, and Contractor was not to enter the property. Contractor also was informed that any plan to cure the default would be considered by Developer if such a plan was duly presented. When Contractor was not able to complete the project, Mullins gave Kirkham a list of vendors who still were owed money, and Developer made sure that those vendors were paid. By the time Contractor was removed from the project by Developer, Contractor had been paid $3,260,420.38.

Kirkham testified to the monetary damages incurred by Developer as a result of Contractor's breach. Kirkham stated that Developer incurred a total of $381,886.18 in expenses to complete the project after Contractor was removed. Kirkham testified to the various expenses and a detailed list of the expenses incurred in completing the project was entered as an exhibit at trial. In summary, after giving Contractor credit for the original contract amount that had not been paid and subtracting the amount paid by Ohio Farmers pursuant to the performance bond, Developer was seeking a total of $128,326.56 in damages for Contractor's breach of the contract.[4] Kirkham testified that this amount was accurate and reasonable.

On cross-examination, Kirkham identified the three other bids on the contract at issue. The highest bid was from G.W. Wyatt and was for $6,783,166. The next highest

---

[4] The amount of damages would have been substantially more had Developer not successfully convinced Lowe's not to pursue its claim for liquidated damages due to the project not being timely completed.

-10-

bid was from Whaley and Sons and was for $5,931,234. The lowest of the other three bids and the one closest to Contractor's bid was from Plateau Excavation and was for $5,233,200. One of the line items on the bid was for "[g]rading/earthwork, including erosion control and seeding." Contractor put $2,074,130 on this line item, and Plateau Excavation put $3,443,000. When asked if this was the line item where the "mistake" occurred, Kirkham responded "I don't know that. I don't know that there was a mistake." In the estimate prepared by Mr. Robinette, the amount indicated for "master site earthwork" was $2,857,500, which is almost $800,000 more than what was indicated by Contractor on the corresponding line item. Kirkham testified that the day of trial was the first time he saw the other three bids. Kirkham never disclosed the bid spread to Contractor and never was asked by Contractor to do so. Kirkham acknowledged that David Robinette told Contractor that its bid was $300,000 less than the estimate prepared by Robinette.

The next witness was Robinette, a principal with Site, Inc. In 1988, Robinette earned a civil engineering degree from the University of Tennessee. He is a licensed contractor who is licensed both commercially and residentially. Over the years, Robinette has completed site work for numerous Wal-Mart and Walgreens stores, as well as various other stores. Site, Inc., employs fifteen to twenty employees. Robinette sent bid packages to the various companies that bid on the project. The bids were not open to the public. Robinette testified to the estimates he had prepared. The lower estimate was for $3,734,987, and this was for the work for which bids were submitted. After the bids were received, Robinette assembled the information. Then:

> I determined that there was a pretty wide spread in the bids. I called the owners, gave them the information. They either came to my office that afternoon, later on that afternoon, or the following day, and we basically just discussed the next way to proceed. . . .
>
> I called and asked for a qualification meeting. When I met with the owners, I told them we needed to sit down and actually qualify the bids, have a meeting and let Brian [Mullins] explain to us, you know, how he can perform this bid, how he bid it, if he had any qualifications, was there anything here that he needed to tell us before we actually awarded the bid . . . .
>
> We basically started out the meeting and, I guess, told Brian [Mullins] that [Contractor] was low [bidder] on the job, and we wanted him to qualify his bid, you know, and tell us how he's going to perform this job for the price he's going to do it and the

-11-

time frame, because this thing had a very tight time frame with Lowe's . . . .

[At the qualification meeting], Brian basically said that his – this was his hometown, his backyard; he wasn't going to let anybody come and get this out of his backyard. He told us that he was not going to haul off any of this material off the site, that he was going to use it all on site[5] . . . that it was his belief that none of the site, the shale that was on this site, was hard enough that he was going to have to blast, so he had put in no money in his bid to do any kind of drilling or shooting, blasting the site.

And he also informed us that he had two TDOT jobs that he had been awarded and not yet started or was under construction that he was going to get paid to take material to, and he had planned on using [material from] our site . . . to go to those two bridge projects. . . . I think he said he outsmarted all the other bidders.

Robinette and the owners then took a break to discuss what they had been told during the meeting. Shortly thereafter, they returned to the meeting room and informed Mullins that his company was being awarded the contract. Mullins never asked the amount of the next lowest bid and seemed confident in his bid. Within a day or two, Mr. Mullins called and inquired about the bid spread for purposes of obtaining a performance bond. Robinette informed him "that that was not our standard procedure, letting out bid spreads." Robinette refused to tell Mullins the bid spread.

Robinette testified to his ultimately successful efforts to get Lowe's to "back-off" on its claim for liquidated damages. He also explained that Contractor began having problems and requested more money. The retainage on the project was reduced by Developer from 10% to 2.5% in order to free up some money to assist Contractor. Robinette testified that it was "pretty devastating" when Contractor left the project and "all the loose ends that were left." After Contractor left the project, Robinette and John Smith, a former employee of Contractor, were hired to finish the project. Robinette had worked with John Smith in the past and received Developer's approval for him to assist with the completion of this project.

---

[5] The bidders were informed prior to the bids that there was an eight acre site near the Lowe's store where they could haul some of the material that would later be used in a structural fill. The only qualification was that any dirt hauled to that site had to be compacted.

Robinette testified to the reasonableness and necessity of the expenses that were incurred to complete the project. He stated:

There was just a lot of missing parts in this thing. There was a lot of things started. Brian ended up finishing . . . basically to where we got Lowe's opened, and then there was a lot of just peripheral – the back 20 acres were where material was pulled. That was basically left pretty much unattended, had drainage problems, had erosion control problems.

None of the wetland mitigation planning had been done, not all of the excavation for the wetland mitigation, the actual landscaping of the stream. What I mean by that, actually coming in, putting in the J-hooks for the pooling areas of the creek relocation . . . . There's just a lot of complicated issues with the stream relocation. There was a company – I think it's invoiced in here – that came in and actually did that type of work.

There was also the problems we were having with the Lowe's, trying to defend against Lowe's on the liquidated damages, trying to get them off our back, convincing them that we did not – that we performed our contract – that Brian performed his timeliness the best he could do with the weather conditions, with the site-work conditions . . . .

We also . . . had to spend a lot of time talking to regulators and getting extensions on permits, because those run out after a certain amount of time. You have to get them extended, which means they have to come to the site and meet. You have to walk it and talk about your game plan, make sure you have no violations.

So there was just a lot of time spent. Yes, this was very reasonable.

On cross-examination, Robinette testified that he recalled at least two occasions where Mullins requested the bid spreads, and both times Robinette refused to disclose that information. Robinette did not recall ever telling Mullins that the bids were close.

The next witness was John Smith, who formerly was employed by Contractor and who was hired by Robinette to help complete the project once Contractor left the job. Smith's testimony was limited to various items of damages that Developer was seeking at trial. With respect to these items, which included Smith's time and items purchased after Contractor left the job, Smith testified that the charges incurred and the work performed were reasonable and should have been completed by Contractor pursuant to the original contract.

The next witness was Contractor's owner, Brian Mullins. At the relevant time, Mullins was employed by Contractor, which provided grading and excavation services, building roads and commercial sites, etc. Contractor had been in business since 1994. Mullins testified that Contractor receive an invitation to bid on the project by Site, Inc. Contractor had a software program that helped it make calculations regarding the amount to bid on this project. Certain information was provided by Contractor's engineer, John Smith, and the program computed various costs for the project such as removing dirt, etc. Mullins was involved in creating the bid, but most of the information was provided by John Smith and his son, Benji Smith. This bid was submitted without a bid bond because Mullins needed to know the other bids in order to obtain such a bond. In any event, Mullins received a telephone call from Robinette after the bids had been submitted. According to Mullins:

> David [Robinette] said, hey, Brian, this is David. I'm here at the office, and Steve and Jerry are here now, and we're on conference call. And he said – and each party identified themselves. And they said, basically, congratulations are in order. And everybody seemed to be genuinely happy. . . . Steve Kirkham said, we're proud that someone from Roane County got this project. We like to see the money stay around here local.

> \* \* \*

> And I did ask, I said, well, how tight was the bid? How close was the bid? How close was I on my bid? And, oh, it was tight. This was probably the tightest bid we've seen on a job this size. This was close.

> Q. Who told you that?

A. Well, David Robinette said that, and also I do recall Jerry Duncan making a comment about the tight – the bid was tight, that he said it was tight.[6]

According to Mullins, he called the bonding agent who told Mullins he needed the bid spread in order to prepare the bond. Mullins called Robinette for the spread, and Robinette refused to provide it. Mullins then told the bonding agent that Robinette would not provide that information. The bonding agent told Mullins that without that information, no bond would be issued. Mullins then called Robinette back. According to Mullins, Robinette told him that he could not and would not release the bid spread because Contractor was not necessarily the lowest bidder. When asked who was the lowest bidder, Robinette allegedly told Mullins that Plateau Excavating was the lowest bidder, but Contractor was chosen because it was a local company. Mullins then called the bonding agent back who asked Mullins how comfortable he was with Contractor's bid. Mullins said he was comfortable with the bid and the agent told him to "write down that we were the low bidder and add 10% between two separate bidders and turn it in, and they would issue the payment bond." In short, Mullins admitted that he submitted an inaccurate bid spread so that the performance bond would be issued.

Mullins acknowledged that there was a meeting before the contract was signed and that Robinette and Kirkham were at the meeting. Mullins denied stating that he had "outsmarted" the competition, although the project certainly was discussed. Mullins did ask if some of the spoil material could be placed in the empty lot behind Lowe's. Mullins was granted permission to do that so long as it was compacted. Mullins denied making any comments about using some of the material at other job sites, although he did admit that some of the dirt was used on a job he was doing for TDOT.[7]

The project did not go as planned due to the heavy amounts of rain that year. They lost a total of 72 days due to the rain. There also was a problem with needed permits.

---

[6] Walter Pounds apparently was riding with Mullins when this conversation occurred. Pounds is a life-long friend of Mullins and was employed by Contractor at the time of the conversation. This conversation allegedly was on Mullins' speakerphone and Pounds heard the entire conversation. Pounds testified at trial consistent with Mullins as to what was said about the bid being "tight."

[7] James Redmond, who worked for Contractor at the relevant time, testified that dirt from the Pinnacle Point project was sold to the State on a different project for approximately $220,000, which would have resulted in a net profit to Contractor of at least $100,000. Redmond testified that this gave Contractor a competitive advantage over other bidders. Redmond testified that this "advantage" was discussed at the meeting which took place after the bids were submitted. According to Redmond, Mullins also stated at the meeting that he had an advantage because he was going to rip the shale as opposed to blasting it.

-15-

Even though the contract required Contractor to obtain any necessary permits, Mullins incorrectly was told that the permits were already in place. The project was practically shut down from May 20 through June 8 while Contractor obtained the needed permits. Mullins testified to the extra steps that Contractor took in its attempt to complete this project on time, notwithstanding the setbacks from the weather and permits, etc. These efforts included renting extra equipment and using a second shift for a period of time.

Mullins testified that it eventually became clear to him that Contractor was not going to be able to complete the job. Contractor had completely run out of money and Mullins had used up all of his savings. Mullins stated:

> We got to the point to where we were just completely out of money, and I was completely lost as to why this had happened. And I called David Robinette, and I told David, I said, David, we're not going to be able to make it. I don't have the money to do it. I don't know why this job, there is not enough money in the job to finish it. And I said, David, what have I done wrong? Have I left – did I leave just a ton of money on the table?

According to Mullins, Robinette told him that his bid was about $300,000 lower than the amount Robinette estimated this project would cost, so he had left $300,000 on the table. Mullins testified that the project was almost complete and Contractor had completed 96% of the project. What was left to be done was minimal. Contractor eventually was told to leave the site.

In November of 2005, the bonding company was able to obtain the actual bid spreads, and that information was relayed to Mullins. That is when Mullins discovered that an error had been made by Contractor in computing the swell factor for the shale and that is why there was such a discrepancy in the bids. Because of the mistake in entering the swell factor, Contractor ended up moving 50% more material from the site than was called for in its bid. Mullins estimated that it cost an additional $800,000 to move this extra material.[8]

---

[8] Mullins never explained why he did not figure out that his bid was too low while he was performing the work. In other words, if Contractor had to spend an additional $800,000 hauling material that it did not originally anticipate, Mullins offered no explanation for why he did not figure that out while all this additional material actually was being moved, as opposed to when the bid spreads were revealed to the bonding company after Contractor already had been removed from the project.

Vickie Barnes ("Barnes") was called as a witness. Although not married to Mullins, Ms. Barnes lives with Mr. Mullins and is the mother of his children. Barnes worked for Contractor during the relevant time. Barnes testified in depth to all the various expenses incurred by Contractor on this project. In summary, Barnes concluded that Contractor spent $3,628,026.39 on the project, and was paid a total of $3,260,420.00, resulting in net damages of $367,606.39. These numbers do not reflect Contractor's profit margin of 15%, which would increase the amount of damages. In addition, Barnes testified that Contractor had to repay the bonding company $125,000, and this amount would increase the damages to $492,606.39.[9]

During a rigorous cross-examination, Barnes admitted that there were several errors in her calculations and some items pertained to other projects and, therefore, should not have been included as damages related to this case. Those errors totaled almost $170,000.00.

After the trial was completed, the Trial Court announced its decision from the bench. In summary, the Trial Court concluded that a unilateral mistake had been made by Contractor, and Contractor had failed to prove that Developer engaged in fraud. The Trial Court went so far as to state that had Contractor not been so determined to get the bid, it could have bid more, up to the $3,734,987.04 estimate made by Mr. Robinette. The Trial Court called the mistake a clerical error which was caused in part by Mullins being "overly competitive and overly shaving the low side of things in an effort to get the job." The Trial Court also found that the purpose of the post-bid meeting was to make sure Contractor could complete the project for the amount of its bid. Notwithstanding all of these findings, the Trial Court, nevertheless, stated that it was "equitable" to award Contractor a judgment in the amount of $101,357.05. When counsel for Developer inquired about Developer's claim, counsel was informed by the Trial Court that the amount of Contractor's judgment had been "reduced" by Developer's claim for $128,326.56.[10]

The Trial Court then entered a final judgment awarding Contractor $101,357.05. Thereafter, Developer filed a motion to clarify requesting the Trial Court "clarify the damages awarded by showing the specific basis for damages awarded. . . ."

_____

[9] The bonding company paid a total of $475,000 on several of Contractor's projects. Of the total $475,000, the amount attributable to the project at issue in this case is $150,000. The $475,000 claim was settled in bankruptcy court for $125,000. Even though the Pinnacle Point project accounted for roughly only 32% of the total claim, at trial Contractor was seeking to recover the entire $125,000 from Developer.

[10] It necessarily follows that by reducing the judgment to Contractor by $128,326.56, the Trial Court must have found Contractor to be in breach of the contract and that Developer had proven the stated amount of damages.

Developer also requested that the Trial Court adopt the findings of fact made following the trial and incorporate those findings into its final judgment.[11] The Trial Court denied this motion and refused to adopt its findings of fact made post-trial.

Developer appeals claiming there was no legal basis for the Trial Court to award damages to Contractor because any harm to Contractor was the result of its own unilateral mistake that was made when bidding on the project. Developer also claims that the Trial Court erred when it refused to clarify its judgment and state the facts it relied upon to support an award of damages to Contractor. Developer claims the facts preponderate against an award of damages to Contractor and requests this Court vacate that award, and award Developer a judgment for its proven damages in the amount of $128,326.56. Contractor asserts that the findings and conclusions of the Trial Court were correct, except to the extent it did not find that Developer had acted fraudulently.

**Discussion**

Ordinarily, following a bench trial the factual findings of a trial court are accorded a presumption of correctness, and we will not overturn those factual findings unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). With respect to legal issues, our review is conducted "under a pure *de novo* standard of review, according no deference to the conclusions of law made by the lower courts." *Southern Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). In this case, however, the Trial Court, without explanation, expressly refused to adopt its factual findings made post-trial. As explained by this Court in *Brown v. Schierholz*, No. M2005-02031-COA-R3-CV, 2006 WL 4041898 (Tenn. Ct. App. Feb. 9. 2006), *no appl. perm. appeal filed*:

> When a trial court does not make findings of fact, "we must conduct our own independent review of the record to determine where the preponderance of the evidence lies." *Brooks v. Brooks*, 992 S.W.2d 403, 405 (Tenn. 1999). This Court has held:

---

[11] The proposed final judgment submitted to the trial court for entry stated that Contractor was awarded a judgment in the amount of $101,375.05, and that said judgment was "consistent with this Court's findings attached hereto as Exhibit A." Exhibit A was a transcript of the findings of fact announced by the Trial Court following trial. The Trial Court crossed-out the portion of the final judgment quoted in this footnote and refused to incorporate Exhibit A into its final judgment.

-18-

> Without findings of fact, there is nothing in the record upon which the presumption of correctness set forth in Tennessee Rule of Appellate Procedure 13(d) can attach. This Court, therefore, reviews the record *de novo* without a presumption of correctness.
>
> *Devorak v. Patterson*, 907 S.W.2d 815, 818 (Tenn. Ct. App. 1995).

*Brown*, 2006 WL 4041898, at *5. For this reason, we have conducted an independent review of the record before us "to determine where the preponderance of the evidence lies." *Id.*

In *Zion Hill Baptist Church v. Taylor*, No. M2002-03105-COA-R3-CV, 2004 WL 239760 (Tenn. Ct. App. Feb. 9, 2004), *no appl. perm. appeal filed*, this Court discussed unilateral mistakes as follows:

> "To reform a written instrument for mistake, there must have been a mutual mistake, or mistake of one party influenced by the other party's fraud." *McMillin v. Great S. Corp.*, 480 S.W.2d 152, 155 (Tenn. Ct. App. 1972) (citing *Jones v. Jones*, 266 S.W. 110 (Tenn. 1924)). . . .
>
> [I]t is well-settled that a unilateral mistake alone by one party is insufficient for invalidating an agreement; it must be coupled with or induced by the fraud or inequitable conduct of the other party. *Renfroe v. Cameron*, No. 64, 1989 Tenn. App. LEXIS 507, at *2 (Tenn. Ct. App. July 28, 1989) (citing 66 Am. Jur.2d *Reformation of Instruments* § 12). Whether attempting to demonstrate the need for reformation based upon mutual mistake or unilateral mistake coupled with fraud, the evidence must be clear, cogent, and convincing. *Marron v. Scarbrough*, 314 S.W.2d 165, 173 (Tenn. Ct. App. 1958).

*Zion Hill Baptist Church*, 2004 WL 239760, at *3. *See also R&R Plaza, Ltd. v. SBR Corp.*, No. 03A01-9311-CH-00418, 1994 WL 129850, at *2 (Tenn. Ct. App. Apr. 8, 1994)("To be the subject of reformation, Tennessee courts hold that a mistake must have been mutual or there must have been a mistake of one party influenced by the fraud of the other.").

The evidence in this case preponderates in favor of a finding that Contractor made a unilateral mistake in the bid it submitted. In all fairness, both parties acknowledge

as much in their briefs. The dispute centers around whether Developer knew of that mistake and, if so, whether Developer fraudulently took advantage of the situation.

We conclude that Contractor failed to establish by clear and convincing evidence that Developer was aware that a mistake had been made and that it thereafter fraudulently took advantage of that mistake. There is no doubt that Developer and Robinette were aware of the discrepancy in Contractor's bid and the next lowest bid. It, however, was because of this discrepancy that Developer had a meeting to ensure that Contractor could perform the project for the stated amount of its bid. Contractor assured Developer that it could complete the project for the amount contained in its bid, which was only 10% lower than the estimate prepared by Robinette. Because we find that Contractor made a unilateral mistake and there was no fraud on the part of Developer, the contract could not be reformed on the basis of a unilateral mistake.

Contractor has not alleged or proven any other basis upon which to justify setting aside or reforming the contract. As such, we find that the contract between Contractor and Developer is an enforceable contract. The evidence preponderates in favor of a finding that Contractor breached the contract. The record is devoid of any basis upon which to award Contractor a judgment, much less a judgment in the amount of $101,357.05.[12] This Court has explained that, in the absence of fraud or the type of mistake that would merit setting aside a contract, "the courts will not create or rewrite a contract simply because its terms are harsh or because one of the parties was unwise in agreeing to them." *Dobbs v. Guenther*, 846 S.W.2d 270, 276 (Tenn. Ct. App. 1992).

The judgment of the Trial Court awarding a judgment to Contractor for $101,357.05 is vacated. During the trial, sufficient proof was presented by Developer to establish Contractor's breach of contract and the amount of damages resulting from the breach.[13] Although we did not recite all of the proof on this issue, the testimony of Developer's witnesses showed that Developer incurred gross damages totaling $381,886.18 when it was required to complete the project. From this amount, Developer properly reduced the claimed damages by the amount not paid to Contractor under the original contract ($103,559.62) and the amount paid by Ohio Farmers ($150,000), resulting in a net damages of $128,326.56. A judgment is hereby entered in favor of Developer for this amount.

---

[12] We are unable to ascertain exactly how the Trial Court arrived at a judgment for Contractor in the amount of $101,357.05.

[13] We again note that the Trial Court found Developer had been damaged in the amount of $128,326.58 after implicitly finding Contractor in breach.

## Conclusion

The Trial Court's award of a judgment in favor of Brian Mullins Excavating Contractors, Inc., in the amount of $101,357.05 is vacated. A judgment is hereby entered for Prestige Land Company in the amount of $128,326.56. This cause is remanded to the Trial Court solely for collection of the costs below. Costs on appeal are taxed to the Appellee, Brian Mullins Excavating Contractors, Inc., for which execution may issue, if necessary.

_____

D. MICHAEL SWINEY, JUDGE